**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Orlando Division**

| | |
|---|---|
| KATHY ALEXANDER, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br>   v.<br><br>CG BLACK FINANCIAL SERVICES, INC. d/b/a BLACK INSURANCE & FINANCIAL SERVICES, a Florida corporation,<br><br>       Defendant. | Case No.<br><br>**CLASS REPRESENTATION**<br><br>DEMAND FOR JURY TRIAL |

**CLASS ACTION COMPLAINT**

Plaintiff Kathy Alexander ("Plaintiff"), individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to herself and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant CG BFS Financial Services, Inc. d/b/a Black's Insurance & Financial Services ("BFS" or "Defendant"), and alleges as follows:

**INTRODUCTION**

1. Plaintiff brings this action on behalf of herself and all other individuals similarly situated ("Class Members") against BFS for its failure to secure and safeguard the personally identifiable information ("PII") (collectively, the "Private Information") of Plaintiff and Class Members.

2. Defendant BFS, a Florida corporation, operates as an independent insurance agency, providing personal and commercial insurance services to clients throughout Florida and other states. [1] In the regular course of its business, BFS collects, stores, and maintains the PII of

---

[1] https://blacksinsurance.com/

individuals and is required to maintain reasonable and adequate security measures to protect such information from unauthorized access and disclosure.

3.    According to a data breach notification ("Breach Notice") sent to Plaintiff and Class Members, BFS learned that an unauthorized third party had gained access to two BFS employee e-mail accounts, beginning on or about March 21, 2025, and had accessed mail items within those accounts containing PII of individuals, including Plaintiff (the "Data Breach").

4.    BFS owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. BFS breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect individuals' PII from unauthorized access and disclosure, or by contracting with companies that failed to do so. Every year, millions of Americans have their most valuable PII stolen and sold online because of data breaches. Despite dire warnings about the severe impact of data breaches on Americans across all economic strata, companies still fail to make the necessary investments to implement adequate security measures to protect individuals' data.

5.    BFS required its individuals to provide sensitive PII and failed to protect that information. BFS had an obligation to secure individuals' PII by implementing reasonable and appropriate data security safeguards. This was part of the bargain between BFS and Plaintiff and Class Members.

6.    As a result of BFS's failure to provide reasonable and adequate data security, Plaintiff's and the Class Members' unencrypted, non-redacted PII has been exposed to unauthorized third parties. Plaintiff and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII stolen here and the fact that

the compromised PII is likely already being sold on the dark web. This risk constitutes a concrete injury suffered by Plaintiff and the Class as they no longer have control over their PII, which PII is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

7.     Plaintiff and the Class will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

8.     Plaintiff brings this action on behalf of herself and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring BFS to ensure that it implements and maintains reasonable data security practices going forward.

## THE PARTIES

9.     Plaintiff Kathy Alexander is a citizen of the State of Florida, whose PII was compromised as a result of the Data Breach.

10.     Defendant BFS is a Florida corporation with its principal place of business in Plant City, Florida.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

12.     This Court has personal jurisdiction over Defendant because it maintains its principal place of business in this District and conducts business in this District.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant has its principal place of business in this District, conducts business in this District, and a substantial part of the events, acts, and omissions giving rise to Plaintiff's and Class Members' claims occurred in this District.

**<u>GENERAL ALLEGATIONS</u>**

14.    This is a class action brought by Plaintiff, individually and on behalf of all citizens who are similarly situated (i.e., the Class Members), seeking to redress BFS's willful and reckless violations of their privacy rights. Plaintiff and the other Class Members are individuals whose Private Information was collected, maintained, and stored by BFS in connection with the credit analysis, credit repair, and credit restoration services it provides to consumers.

15.    Beginning on or about March 21, 2025, an unauthorized third party gained access to two BFS employee e-mail accounts and thereby accessed and obtained Plaintiff's and the Class Members' PII.

16.    This action pertains to BFS's unauthorized disclosures of Plaintiff's PII that occurred during the Data Breach.

17.    BFS disclosed Plaintiff's and the other Class Members' PII to unauthorized persons as a direct and/or proximate result of BFS's failure to safeguard and protect their PII.

18.    By obtaining, collecting, and storing the PII of Plaintiff and Class Members, BFS assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII from unauthorized disclosures.

19.    Despite recognizing its duty to do so, BFS failed to implement security safeguards to protect Plaintiff's and the Class Members' PII.

20.    Plaintiff and Class Members have taken reasonable steps to maintain the

confidentiality of their PII and relied on BFS to keep their PII confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

## A. The Data Breach

21.     According to the Breach Notice sent to Plaintiff and Class Members, BFS experienced unauthorized access to two employee e-mail accounts beginning on or about March 21, 2025. During this period, an unauthorized third party accessed the e-mail accounts and the mail items contained therein, which included individuals' PII, including full names and Social Security numbers.

22.     Upon discovering this unauthorized access, Defendant secured the compromised e-mail accounts and commenced an investigation, which determined that an unauthorized actor had accessed the accounts and the mail items contained therein beginning on or about March 21, 2025. However, Defendant did not begin notifying affected individuals until June 2026, more than a year after the unauthorized access began, that their Private Information may have been compromised as a result of the Data Breach. During that entire period, Plaintiff and Class Members were unaware that their Private Information had been compromised and were unable to take any protective measures.

23.     The Breach Notice posted on BFS's website did not specify detailed measures or actions taken by BFS to fully remediate the vulnerabilities that led to the Data Breach, nor did it explain specific measures adopted to prevent future incidents.

## B. Defendant's Data Security Obligations and the Applicable Standard of Care.

24.     The Federal Trade Commission has long advised businesses that reasonable data security includes building security into operations from the outset, employing access controls and strong authentication, conducting network monitoring and segmentation, providing secure remote

access, applying timely patches, and implementing secure development practices.[2] The FTC has further explained that reasonable security includes inventorying stored personal information, securely disposing of unneeded data, encrypting sensitive information, understanding system vulnerabilities, and planning ahead for breaches.[3]

25.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principles for business.[4] Among other things, the guidelines note that businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to address security issues. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[5]

26.     Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[6]

27.     Highlighting the importance of protecting against phishing and other types of data

---

[2] *See* Fed. Trade Comm'n, *Start with Security: A Guide for Business* (June 2015), https://www.ftc.gov/business-guidance/resources/start-security-guide-business.
[3] *See* Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.
[4] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-inform ation.pdf.
[5] *Id.*
[6] *Id.*

breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

28.    The National Institute of Standards and Technology ("NIST") has published a comprehensive catalog of security and privacy controls that establishes objective benchmarks for reasonable security, including controls for access management, incident response, risk assessment, audit logging, authentication, and vendor management.[7] NIST has further published current best-practice guidance on incident response that aligns with the NIST Cybersecurity Framework 2.0.[8]

29.    The Center for Internet Security has published the CIS Critical Security Controls, a prioritized and actionable set of safeguards that maps to NIST and other authoritative frameworks and represents the consensus industry best practice for reasonable security.[9]

30.    The U.S. Department of Health and Human Services, through its 405(d) Program, has published cybersecurity guidance specifically addressed to the healthcare sector, identifying practical safeguards that healthcare organizations are expected to implement to address the sector's most significant threats, including email protection, endpoint protection, access management, data

---

[7] *See* Joint Task Force, Nat'l Inst. of Standards & Tech., *Security and Privacy Controls for Information Systems and Organizations*, NIST Special Publication 800-53, Rev. 5 (Sept. 2020), https://doi.org/10.6028/NIST.SP.800-53r5.
[8] *See* Nat'l Inst. of Standards & Tech., *Incident Response Recommendations and Considerations for Cybersecurity Risk Management: A CSF 2.0 Community Profile*, NIST Special Publication 800-61, Rev. 3 (Apr. 2025), https://csrc.nist.gov/pubs/sp/800/61/r3/final.
[9] *See* Ctr. for Internet Sec., *CIS Critical Security Controls* (v8.1) (2024/2025), https://www.cisecurity.org/controls/v8-1.

protection, vulnerability management, and incident response.[10] HHS has also published Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals, identifying foundational practices that the healthcare sector should prioritize, including vulnerability mitigation, email security, multi-factor authentication, encryption, credential management, and incident planning.[11]

31.    The Office for Civil Rights of the Department of Health and Human Services ("OCR") has long published security guidance for covered entities and business associates, confirming that the basic safeguards and cyber preparedness obligations applicable to Defendant are longstanding regulatory expectations rather than novel or emerging duties.[12]

32.    The Cybersecurity and Infrastructure Security Agency ("CISA"), in conjunction with the Multi-State Information Sharing and Analysis Center, has published the #StopRansomware Guide, which prescribes basic, well-established measures that organizations— including healthcare providers — are expected to implement to mitigate the threat of ransomware and similar intrusions, including phishing-resistant multi-factor authentication, prompt installation of operating-system and software updates, and ongoing user training.[13]

33.    By collecting, using, and storing Plaintiff's and Class Members' Private Information for its commercial benefit, Defendant assumed a duty to implement and maintain reasonable security measures consistent with applicable federal and industry standards. Defendant's duty included, but was not limited to, encrypting Private Information at rest and in

---

[10] *See* U.S. Dep't of Health & Human Servs., 405(d) Program, *Health Industry Cybersecurity Practices: Managing Threats and Protecting Individuals* (2023 ed.), https://405d.hhs.gov/Documents/HICP-Main-508.pdf.
[11] *See* U.S. Dep't of Health & Human Servs., *Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals* (2024), https://hhscyber.hhs.gov/documents/cybersecurity-performance-goals.pdf.
[12] *See* U.S. Dep't of Health & Human Servs., Off. for Civil Rights, *Security Rule Guidance Material*, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.
[13] *See* Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., *#StopRansomware Guide* (updated Mar. 2025).

transit, implementing multi-factor authentication, deploying logging and monitoring systems sufficient to detect intrusions, maintaining current operating systems and software patches, training its workforce on data security and phishing risks, and implementing reasonable policies and procedures to detect, respond to, and contain security incidents.

### C. The Data Breach was Preventable

34.    The Data Breach was eminently foreseeable. The healthcare sector has long been a leading target of cyberattacks, and Defendant knew, or, in the exercise of reasonable care, should have known, that its network and the Private Information stored on it were likely targets of cybercriminals.

35.    Federal regulators have repeatedly warned the healthcare sector about the foreseeable risk of cyberattacks. The HHS 405(d) Program and HHS's Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals were promulgated specifically because cyberattacks against healthcare entities were known to be common, foreseeable, and devastating to individuals.[14] CISA has likewise issued ongoing public guidance for the healthcare sector regarding ransomware and similar intrusions.[15]

36.    Numerous publicly reported cyberattacks against healthcare providers in the years preceding the Data Breach put Defendant on notice of the foreseeability of the Data Breach and of the categories of Private Information likely to be targeted. Healthcare providers have repeatedly been the subject of high-profile cyberattacks resulting in the compromise of patient PII and PHI in volumes ranging from tens of thousands to tens of millions of records. The healthcare sector's sustained position as one of the most-targeted sectors for cyberattacks is well documented.[16]

---

[14] *See* supra note 11.
[15] *See* supra note 12.
[16] *See* Identity Theft Resource Ctr., 2025 Annual Data Breach Report (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-

37.     Had BFS maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, it could have safeguarded patient data. BFS's lack of security controls and the delayed implementation of enhanced security measures only after the Data Breach are inexcusable.

38.     BFS was at all times fully aware of its obligation to protect individuals' PII and the risks associated with failing to do so. BFS knew that information of the type collected, maintained, and stored by BFS is highly coveted and a frequent target of hackers.

39.     This exposure, along with the fact that the compromised PII is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:



40.     By 2013, it was being reported that nearly one out of four data breach notification recipients become a victim of identity fraud.[17]

---

Report.pdf (healthcare sector ranked second-most targeted industry with 534 compromises in 2025, behind only financial services (739); it had been the single most-targeted sector each year from 2018 through 2023 and remained among the top two in both 2024 and 2025).

[17] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 20, 2025).

41.     Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

42.     When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[18]

43.     In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attack targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomeware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[19]

44.     In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[20]

45.     In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million individuals was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its systems on March 6, with some found to be infected with malicious code…According to MCNA, the hackers were successful in

---

[18] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Feb. 1, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.
[19] Mark Rosanes, *The insurance industry cyber crime report:  recent attacks on insurance businesses*, INSURANCE BUSINESS (June 12, 2023),https://www.insurancebusinessmag.com/us/guide s/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx.
[20] *Id.*

accessing individuals' personal information."[21]

46.    In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[22]

47.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[23]

48.    Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. "As data breaches in the news continue to show, PII about employees, individuals, and the public is housed in all kinds of organizations, and the increasing digital transformation of

---

[21] *Id.*

[22] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

[23]  Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), https://www.cisa.gov/sites/default/files/2023-01/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf.

today's businesses only broadens the number of potential sources for hackers to target."[24]

49.     The PII of consumers remains highly valuable to criminals, as evidenced by the prices they pay on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[25] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[26] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[27]

50.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[28]

---

[24]*Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/st olen-PIIramifications-identity-theft-fraud-dark-web/.

[25] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[26]  Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc26db2.

[27] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Sept. 30, 2025).

[28] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION, Pub. No. 05-10064 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

51.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

52.     Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[29]

53.     Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

54.     The PII compromised by the Data Breach demands a much higher price on the BFS market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the BFS market."[30]

55.     Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional

---

[29] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[30] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

56.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

57.     Victims of identity theft also often suffer embarrassment, BFSmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

58.     Data breaches facilitate identity theft, as hackers obtain consumers' PII and use it to siphon money from existing accounts, open new accounts in their victims' names, or sell consumers' PII to others who do the same.

59.     For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[31] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[32]

60.     The exposure of Plaintiff's and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals

---

[31] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.
[32] *Id.*

to profit off this highly sensitive information.

### D. The Impact of Data Breach on Victims

61.    BFS's failure to keep Plaintiff's and Class Members' PII secure has severe ramifications. Given the highly sensitive nature of the PII stolen in the Data Breach, Social Security numbers, first and last names, dates of birth, and medical information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

62.    The PII exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the PII to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

63.    Further, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

64.    Given the confirmed exfiltration of patient PII from BFS, many victims of the Data Breach have likely already suffered significant harms, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and

insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

65.    It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;

- 76% felt violated;

- 32% experienced financial-related identity problems;

- 83% reported being turned down for credit or loans;

- 32% reported problems with family members as a result of the breach;

- 10% reported feeling suicidal.[33]

66.    Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;

- 37.1% reported an inability to concentrate/lack of focus;

- 28.7% reported they were unable to go to work because of physical symptoms;

- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[34]

---

[33]IDENTITY THEFT RESOURCE CENTER, *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces* (2021), https://www.idtheftcenter.org/w p-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf.
[34] *Id.*

67.    Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

68.    The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.[35]

69.    Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

70.    As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

---

[35] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

a. The unconsented disclosure of confidential information to a third party;

b. Unauthorized use of their PII without compensation;

c. Losing the value of the explicit and implicit promises of data security;

d. Losing the value of access to their PII permitted by BFS without their permission;

e. Identity theft and fraud resulting from the theft of their PII;

f. Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g. Anxiety, emotional distress, and loss of privacy;

h. The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i. Unauthorized charges and loss of use of and access to their accounts;

j. Lowered credit scores resulting from credit inquiries following fraudulent activities;

k. Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l. The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or more unauthorized third parties.

71.     Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make the individual whole again, as seeking reimbursement typically requires significant time and effort. The Department of Justice's Bureau of Justice Statistics found that identity theft victims, "reported spending an average of about 7 hours clearing

up the issues" relating to identity theft or fraud.[36]

72.     Plaintiff and Class Members place significant value in data security. According to a survey conducted by t h e cybersecurity company FireEye Mandiant, approximately 50% of consumers consider data security a main or important consideration when making purchasing decisions, and nearly the same percentage would be willing to pay more to work with a provider with better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[37]

73.     Plaintiff and Class Members have a direct interest in BFS's promises and duties to protect PII, i.e., that BFS would *not increase* their risk of identity theft and fraud. Because BFS failed to live up to its promises and duties in this respect, Plaintiff and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by BFS's wrongful conduct. Through this remedy, Plaintiff seeks to restore herself and Class Members as close to the same position as they would have occupied but for BFS's wrongful conduct, namely its failure to adequately protect Plaintiff's and the Class Members' PII.

74.     Plaintiff and Class Members further seek to recover the value of the unauthorized access to their PII permitted through BFS's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented

---

[36] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

[37] Richard Turner, *Beyond the Bottom Line: The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html.

invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles, authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiff and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

75.    Plaintiff and Class Members have an interest in ensuring that their PII is secured and not subject to further theft, as BFS continues to hold their PII.

**E.  Defendant Failed to Implement Reasonable Security Measures.**

76.    Notwithstanding the foreseeable risk of a cyberattack and the well-established standards of care set forth above, Defendant failed to implement reasonable security measures sufficient to protect Plaintiff's and Class Members' Private Information from unauthorized access.

77.    The Data Breach itself is evidence that Defendant's data-security practices fell below the applicable standard of care. Upon information and belief, had Defendant implemented industry-standard measures—including, without limitation, encryption of stored Private Information, phishing-resistant multi-factor authentication, network segmentation, robust logging and monitoring systems, prompt patching of known vulnerabilities, secure backup procedures, and adequate workforce training — the unauthorized third party would have been detected and stopped before Private Information could be removed from Defendant's network.

78.    Defendant's failure to detect the unauthorized access for some period of time and

its lengthy delay in completing its investigation and notifying affected individuals further reflect deficient incident-response capabilities inconsistent with the standard of care set forth in NIST SP 800-61 Rev. 3 and the FTC's *Data Breach Response: A Guide for Business* (Aug. 2023).[38]

### F.  Plaintiff Alexander's Experience

79.     Plaintiff Kathy Alexander is a current or former customer of BFS who purchased insurance coverage placed and serviced through BFS.

80.     As a condition of receiving those services, Plaintiff was required to provide BFS with her Private Information, including her name and Social Security number. Plaintiff did so with the reasonable expectation that BFS would safeguard that information.

81.     Plaintiff did not know why her accounts had been repeatedly compromised until she received BFS's Breach Notice informing her that her name and Social Security number may have been accessed as a result of the Data Breach.

82.     In fact, Plaintiff has received text message alerts from her bank regarding suspicious activity on her accounts, consistent with the exposure of her Private Information on the dark web as a result of the Data Breach.

83.     As a direct and proximate result of the Data Breach, in the two months preceding the filing of this Complaint, Plaintiff has experienced repeated account fraud and identity theft consistent with the misuse of her Private Information, including but not limited to: (a) her bank account numbers being changed on three separate occasions due to suspected compromise; (b) an unauthorized attempt to obtain a loan in her name; (c) the fraudulent purchase of a $500 gift card on her Amazon account; and (d) unauthorized charges placed on her Macy's account. Plaintiff has also experienced a marked increase in unsolicited spam telephone calls consistent with the

---

[38] https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business.

22

exposure of her Private Information. Plaintiff's experience is ongoing, and she continues to discover new instances of attempted or actual fraud.

84.　Plaintiff has spent, and will continue to spend, time and effort responding to the Data Breach, including monitoring her financial accounts and incoming communications for indicia of identity theft. Plaintiff has taken steps to protect herself and her identity in response to the Data Breach, including changing her passwords, contacting her bank, and freezing her credit with all credit bureaus.

85.　Plaintiff has suffered, and will continue to suffer, anxiety, concern, and emotional distress arising from the loss of control over her Private Information and from the imminent and ongoing risk that her Private Information will be used to commit identity theft or fraud against her.

86.　Plaintiff did not consent to BFS's release of her Private Information to unauthorized third parties, and Plaintiff would not have provided her Private Information to BFS, or would have provided less of it, had she known of BFS's deficient cybersecurity practices.

**G. Injuries Suffered by Plaintiff and the Class.**

87.　As a direct and proximate result of the Data Breach, Plaintiff and Class members have suffered, and will continue to suffer, injury and damages, including, but not limited to:

a) the unauthorized acquisition and disclosure of their Personal Information by criminal third parties, and the corresponding loss of privacy and confidentiality in that information;

b) a substantial and certainly impending increased risk of identity theft, financial fraud, medical identity theft, and other forms of misuse of their Personal Information—risks that justify and require ongoing expenditures for protective and remedial services;

c) lost time, lost productivity, and out-of-pocket expenses incurred to mitigate and remediate the consequences of the Data Breach, including the costs and effort associated with monitoring credit and financial accounts, placing and lifting fraud alerts and credit freezes, monitoring medical records and explanation-of-benefits statements, and obtaining identity theft and credit monitoring services;

d) the diminished value of their Personal Information, for which there is a well-documented economic market;

e) anxiety, concern, and emotional distress arising from the loss of control over their Personal Information and the ongoing risk of misuse of that information;

f) a marked increase in unsolicited telephone calls, electronic messages, and other communications consistent with the misuse of their Personal Information;

g) the deprivation of the benefit of the bargain in their commercial relationship with Defendant, in that they paid Defendant (directly or through their insurers) for medical services, and a portion of that consideration was understood to be allocated to the protection of their Personal Information, a service Defendant failed adequately to provide; and

h) the continuing risk to their Personal Information, which remains in Defendant's possession and continues to be subject to further unauthorized access in the absence of adequate remediation.

## CLASS ACTION ALLEGATIONS

88.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and the following proposed class (collectively, "the Class"), defined as follows:

**Nationwide Class**
All persons residing in the United States whose personally identifiable information was accessed by and disclosed in the Data Breach to unauthorized persons, including all who were sent a notice of the Data Breach.

89.    Excluded from the proposed Class are any officer or director of BFS; any officer or director of any affiliate, parent, or subsidiary of BFS; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

90.    **Numerosity:** Members of the proposed Class are likely to number in the tens of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from BFS's own records.

91.    **Commonality and Predominance:** Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class

24

Members. These common questions include:

a. Whether BFS engaged in the wrongful conduct alleged herein;

b. Whether BFS's inadequate data security measures were a cause of the Data Breach;

c. Whether BFS owed a legal duty to Plaintiff and the other Class Members to exercise due care in collecting, storing, and safeguarding their PII;

d. Whether BFS negligently or recklessly breached legal duties owed to Plaintiff and the Class Members to exercise due care in collecting, storing, and safeguarding their PII;

e. Whether Plaintiff and the Class are at an increased risk for identity theft because of the Data Breach;

f. Whether BFS failed to implement and maintain reasonable security procedures and practices for Plaintiff's and Class Members' PII;

g. Whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

92. BFS engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale in both quantity and quality by comparison to the numerous questions that dominate this action.

93. **Typicality:** Plaintiff's claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had their PII accessed by and/or disclosed to unauthorized third parties. BFS's misconduct affected all Class Members in the same manner.

94. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class Members she seeks to represent; she has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and

adequately protected by Plaintiff and her counsel.

95.     **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against BFS, making it impracticable for Class Members to individually seek redress for BFS's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create the potential for inconsistent or contradictory judgments, increasing delays and expenses for all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
*(On Behalf of Plaintiff and the Class Against Defendant)*

96.     Plaintiff realleges paragraphs 1 through 95 as if fully set forth herein.

97.     Plaintiff brings this claim individually and on behalf of the Class.

98.     To obtain insurance placement, brokerage, and advisory services, Plaintiff and Class Members were required to provide non-public personal information, including their names and Social Security numbers, to BFS. Plaintiff and Class Members are current or former clients of BFS who entrusted their sensitive PII to BFS in connection with those services. That information was collected, stored, and maintained by BFS as part of its operations, and Plaintiff and Class Members reasonably expected BFS to safeguard their information consistent with its legal and

contractual obligations.

99. By collecting, storing, sharing, and using individuals' data on the Defendant's computer network for commercial gain, BFS owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' PII from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing its data security systems to ensure that Plaintiff's and Class Members' PII in Defendant's possession was adequately secured and protected.

100. Defendant owed a duty of care to Plaintiff and Class Members to maintain data security according to industry standards and other relevant requirements. Defendant was also responsible for ensuring their systems, networks, and personnel adequately protected the Private Information.

101. Defendant's duty of care to use reasonable security measures arose from the relationship between BFS and Plaintiff and Class Members, who entrusted their sensitive PII to BFS in connection with credit analysis and restoration services. This duty is recognized by the FTC's Safeguards Rule and by common-law principles requiring reasonable care in safeguarding confidential information. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members resulting from a Data Breach.

102. Defendant's duty was to implement reasonable security measures to safeguard confidential data from both intentional and unintentional use or disclosure. As a financial institution, Defendant was required to develop, implement, and maintain reasonable administrative, technical, and physical safeguards to protect the security, confidentiality, and integrity of customer information, as set forth in the FTC's Safeguards Rule, 16 C.F.R. Part 314.

103.   In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

104.   Defendant BFS breached its duties by failing to exercise reasonable care and failing to safeguard and protect Plaintiff's and the other Class Members' PII.

105.   It was reasonably foreseeable that BFS's failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class Members' PII would result in an unauthorized third party gaining access to such information for no lawful purpose.

106.   As a direct result of BFS's breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's and Class Members' confidential information, Plaintiff and the Class Members suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation, and loss of enjoyment of life.

107.   Neither Plaintiff nor other Class Members contributed to the Data Breach.

108.   BFS's wrongful actions and/or inaction and the resulting Data Breach constituted, and continue to constitute, negligence at common law.

109.   As a result of BFS's above-described wrongful actions and inaction that directly and proximately caused the Data Breach, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost

opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII, which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) the diminished value of the data-security protections promised for Plaintiff's information

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
*(On Behalf of Plaintiff and the Class)*

110.    Plaintiff realleges paragraphs 1 through 95 as if fully set forth herein.

111.    When Plaintiff and Class Members provided their Private Information in connection with obtaining insurance placement, brokerage, and advisory services from BFS, and BFS thereafter collected, stored, and maintained that information as part of its operations, Plaintiff and Class Members entered into implied contracts with BFS under which BFS agreed to reasonably safeguard and protect their Private Information.

112.    BFS solicited, received, accessed, stored, and processed Plaintiff's and Class Members' Private Information as part of its regular insurance agency operations, including the provision of insurance services. Plaintiff and Class Members provided their Private Information to BFS with the reasonable expectation that it would be safeguarded and protected from unauthorized access.

113.    In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that BFS's data security practices complied with relevant laws and regulations, including HIPAA, and adhered to industry standards applicable to the protection of sensitive healthcare and insurance information.

114.    Plaintiff and Class Members paid money for prescription medications and related pharmacy services, with the reasonable belief and expectation that a portion of those payments

29

would be used to implement and maintain adequate data security measures. BFS failed to maintain reasonable and adequate data security.

115.    Plaintiff and Class Members would not have entrusted their Private Information to BFS in connection with obtaining prescription services in the absence of the implied contracts under which BFS agreed to keep such information reasonably secure.

116.    Plaintiff and Class Members would not have provided their Private Information to BFS, or permitted that information to be collected and maintained by BFS, absent BFS's implied promises to monitor its computer systems and networks and to adopt reasonable data security measures to protect that information from unauthorized access.

117.    BFS breached its implied contract with Plaintiff and Class Members by failing to safeguard and protect their Private Information.

118.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

119.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

120.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, inter alia: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring and identity protection services to all Class Members.

**COUNT III**
**UNJUST ENRICHMENT**
*(On Behalf of Plaintiff and the Nationwide Class)*

121.    Plaintiff realleges paragraphs 1 through 95 as if fully set forth herein.

122.    Plaintiff and Class Members conferred a benefit upon BFS in the form of their

30

Private Information, which BFS collected, stored, and used in connection with insurance placement, brokerage, and advisory services, with the implicit understanding that BFS would adequately safeguard the PII entrusted to it. Additionally, BFS received payment for the insurance services provided to Plaintiff and Class Members.

123. BFS accepted and had knowledge of the benefits conferred upon it by Plaintiff and Class Members, including access to, use of, and reliance upon their PII in the ordinary course of its insurance agency operations. BFS further benefited financially from providing its services to Plaintiff and Class Members while retaining and utilizing their sensitive information.

124. As a result of BFS's conduct, Plaintiff and Class Members suffered actual damages.

125. BFS should not be permitted to retain monies paid to it for credit analysis and restoration services involving Plaintiff's and Class Members' information because BFS failed to adequately implement the data privacy and security procedures required by applicable laws and industry standards.

126. BFS should be compelled to provide, for the benefit of Plaintiff and Class Members, all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT IV**
**DECLARATORY JUDGMENT**
**(28 U.S.C. §§ 2201, 2202)**
*(On Behalf of Plaintiff and the Class)*

127. Plaintiff realleges paragraphs 1 through 95 as if fully set forth herein.

128. An actual controversy has arisen between Plaintiff and Class Members, on the one hand, and Defendant, on the other, concerning Defendant's data security obligations to safeguard the Private Information of Plaintiff and Class Members and the adequacy of Defendant's ongoing data security practices.

129. Plaintiff and Class Members continue to be at substantial and continuing risk of

31

injury arising from the permanent compromise of their Social Security numbers, financial account information, and other Private Information, and they remain dependent on Defendant's ongoing data security practices to prevent further unauthorized access to or disclosure of their Private Information that may remain in Defendant's possession or in the possession of Defendant's affiliates, vendors, and service providers.

130. Defendant's ongoing data security practices have not been demonstrated to be reasonable, and Defendant continues to maintain Private Information regarding Plaintiff and Class Members in environments substantially similar to those that were compromised in the Data Breach.

131. Plaintiff and Class Members seek a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (a) Defendant's existing data security practices are not reasonable and do not comply with applicable legal and industry standards, including the Gramm-Leach-Bliley Act, the FTC's Safeguards Rule, and Section 5 of the Federal Trade Commission Act; (b) Defendant owes a continuing duty of care to safeguard the Private Information of Plaintiff and Class Members; and (c) Defendant must implement and maintain reasonable administrative, technical, and physical safeguards, consistent with the Federal Trade Commission Act, and current industry standards, to protect the Private Information of Plaintiff and Class Members on an ongoing basis.

132. Plaintiff and Class Members also seek such further necessary or proper relief based on the declaratory judgment as the Court may grant pursuant to 28 U.S.C. § 2202

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in her favor and against BFS, as follows:

(a)     Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Lead Counsel for the Class;

(b)     Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

(c)     Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent BFS from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

(d)     Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

(e)     Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

(f)     Awarding Plaintiff and the Class such other favorable relief as allowable under law.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Class Action Complaint.

Dated: July 1, 2026

Respectfully submitted,

*/s/ Robert R. Jimenez*
Robert R. Jimenez (Bar No. 72020)
**BRYSON HARRIS SUCIU**
**& DEMAY PLLC**
201 Sevilla Avenue, Suite 200
Miami, Florida 33134
(786) 206-7896
rjimenez@brysonpllc.com
lblanco@brysonpllc.com

*Counsel for Plaintiff and the Class*

33